# Syllabus

Chief Justice:
Megan K. Cavanagh

Justices:
Brian K. Zahra
Richard H. Bernstein
Elizabeth M. Welch
Kyra H. Bolden
Kimberly A. Thomas
Noah P. Hood

**This syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader.**

Reporter of Decisions:
Kimberly K. Muschong

JACKSON v SOUTHFIELD NEIGHBORHOOD REVITALIZATION INITIATIVE

Docket No. 166320. Argued on application for leave to appeal April 10, 2025. Decided July 16, 2025.

Louis Jackson, Michael C. Birac, and others filed a class action in the Oakland Circuit Court against Southfield Neighborhood Revitalization Initiative (SNRI), Oakland County, the city of Southfield (the city), Southfield Non-Profit Housing Corporation (SNPHC), and others, alleging in part that their constitutional rights of procedural due process, substantive due process, and equal protection had been violated; specifically, plaintiffs asserted that the actions of the governmental entities violated the Takings Clauses of the Michigan and United States Constitutions, Const 1963, art 10, § 2; US Const, Am V. Plaintiffs owned real property in the city and were delinquent on their property taxes between 2012 and 2014. To recover the unpaid taxes, the Oakland County Treasurer, acting as the foreclosing governmental unit (FGU), foreclosed on plaintiffs' properties under the General Property Tax Act (GPTA), MCL 211.1 *et seq.* At the time, former MCL 211.78m, as amended by 2014 PA 501, required the FGU to take title to real property to cover the cost of unpaid tax debt and associated fees, without compensating the owners. Plaintiffs' respective judgments of foreclosure gave them the opportunity to redeem their properties by paying all the delinquent taxes, with interest and associated fees, by a specified date. After plaintiffs failed to pay the specified amounts, judgments of foreclosure were entered, the FGU took title to the properties, and none of the plaintiffs appealed the judgments. The FGU did not put the properties to public auction because the city exercised its right of first refusal under former MCL 211.78m(1) and purchased the properties for the minimum bid with funds from SNPHC; the properties were then conveyed to SNRI, and plaintiffs filed suit. The court, Denise Langford Morris, J., granted defendants summary disposition of all of plaintiffs' claims, reasoning that the court lacked jurisdiction to hear the lawsuit, that plaintiffs lacked standing to bring the suit, and that the suit was barred by res judicata. On appeal, the Court of Appeals, RIORDAN, P.J., and JANSEN and STEPHENS, JJ., affirmed the trial court's order in an unpublished per curiam opinion issued on December 19, 2019 (Docket No. 344058) (*Jackson I*). Plaintiffs sought leave to appeal, and the Supreme Court vacated *Jackson I* and remanded the case to the trial court for reconsideration in light of the Court's decision in *Rafaeli, LLC v Oakland Co*, 505 Mich 429 (2020), which held that then-applicable provisions of the GPTA that permitted governmental units to retain surplus proceeds from public tax-foreclosure sales violated the Takings Clause of the Michigan Constitution. 507 Mich 866 (2021). On remand, the trial court again granted defendants summary disposition, and plaintiffs appealed that decision. The Court of Appeals,

GADOLA, P.J., and CAVANAGH and K. F. KELLY, JJ., affirmed in part, reversed in part, vacated in part, and remanded to the trial court for further proceedings.  Relevant to this appeal, the Court held that: (1) *Rafaeli* applies retroactively; (2) the trial court erred by holding that the federal Takings Clause did not recognize a protected property interest in plaintiffs' equity in their homes; (3) the trial court erred by concluding that *Rafaeli* did not permit plaintiffs' takings claims against Oakland County under the Michigan Constitution; (4) the trial court erred by refusing to give retroactive application to MCL 211.78m, as amended by 2020 PA 255, and MCL 211.78t, as enacted by 2020 PA 256, both of which the Legislature added in response to *Rafaeli*; and (5) the trial court erred when it summarily disposed of plaintiffs' inverse-condemnation claims. 348 Mich App 317 (2023).  Oakland County sought leave to appeal, and the Supreme Court ordered oral argument on whether to grant the application for leave to appeal or take other action.  ___ Mich ___; 12 NW3d 600 (2024).  The Supreme Court directed the parties to address the consolidated cases *Schafer v Kent Co* and *Hathon v Michigan*, ___ Mich ___ (July 29, 2024) (Docket Nos. 164975 and 165219), which held that *Rafaeli* apples retroactively to claims that were not yet final on July 17, 2020, the date the opinion was issued, and that MCL 211.78t applies retroactively to claims that arose from public tax-foreclosure sales that occurred before *Rafaeli* was decided.

In a unanimous opinion by Justice BERNSTEIN, the Supreme Court, in lieu of granting leave to appeal, *held*:

Under former MCL 211.78m(1), a unit of government other than the state exercising its right of first refusal was required to pay only the minimum bid to the FGU.  When a property is not offered for public sale at an auction and instead is transferred to a governmental unit, other than the state, that has exercised its right of first refusal under former MCL 211.78m(1) and has paid the minimum bid to the FGU, the government commits a taking if the value of the property retained exceeds what the government was owed.  The process set forth in MCL 211.78t for claimants to recover remaining proceeds does not apply if the additional value associated with the real property that was acquired or retained by a governmental unit was not reduced to a monetary amount through a sale; therefore, the value of such property interests cannot be obtained through the MCL 211.78t claims process.  Instead, in that circumstance, a claimant could seek the return of any additional value under standard processes of inverse condemnation.  MCL 211.78m, as amended by 2020 PA 255, applies prospectively only because there is no language in the statute indicating that the Legislature intended that it would apply retroactively, and the new provision would impair vested rights.  The Supreme Court reaffirmed its conclusion in *Hathon* that MCL 211.78t applies retroactively to claims that preceded its enactment, but the provision did not apply to this case because plaintiffs' properties were never put up for sale at public auction.  Instead, plaintiffs could seek relief through standard processes of inverse condemnation.  The Court of Appeals' conclusion that plaintiffs had constitutionally valid takings claims against Oakland County was affirmed, the Court of Appeals' conclusion that amended MCL 211.78m applies retroactively was reversed, and the case was remanded to the trial court for further proceedings.

1. Under former MCL 211.78m, when a judgment of foreclosure entered, absolute title to the delinquent property passed to the FGU.  If the FGU was not the state, the state was presented with the opportunity to exercise the right of first refusal to purchase the property from the FGU for the greater of the minimum bid or its fair market value.  But if the state did not exercise this right to purchase the property, the city, village, or township could purchase the property for a

public purpose from the FGU for "the minimum bid," which was defined by former MCL 211.78m(16)(a) as including all delinquent taxes, interest, penalties, and fees due on the property, and the expenses of administering the sale. If the city, village, or township did not purchase the property, the county in which that property was located could purchase the property by paying the minimum bid to the FGU. Article 10, § 2 of Michigan's 1963 Constitution prohibits the government from taking private property for public use without just compensation. In *Rafaeli*, the Court held that when a property has been offered for sale at a public auction, just compensation requires the FGU to return any proceeds from the tax-foreclosure sale in excess of the delinquent taxes, interest, penalties, and fees reasonably related to the foreclosure and sale of the property— no more, no less. The same principles apply when, as in this case, there is no sale by public auction because a governmental unit exercises its right of first refusal under former MCL 211.78m(1); the governmental unit still commits a taking if the value of the property retained exceeds what the government was owed. In this case, the city exercised its right of first refusal, and there was no possibility of surplus proceeds from a foreclosure sale because the properties were never placed for public auction and former MCL 211.78m restricted the city's purchase price to the minimum bid. Therefore, the FGU did not have an opportunity to receive, let alone retain, any surplus funds. Because the properties were purchased for the minimum bid in lieu of being made available to purchase through public auctions, to the extent the value of plaintiffs' respective properties exceeded the amount plaintiffs owed in delinquent taxes and attendant fees, there was a taking without just compensation in violation of Michigan's Takings Clause. The Court of Appeals therefore correctly concluded that plaintiffs had actionable takings claims.

2. After *Rafaeli* was decided, the Legislature amended portions of the GPTA by passing 2020 PA 255 and 2020 PA 256. Relevant here, amended MCL 211.78m(1) now provides that any unit of government exercising its right of first refusal must pay the FGU "the greater of the minimum bid or the fair market value of the property." In contrast, former MCL 211.78m(1) required any city, village, township, or county exercising its right of first refusal to pay only the "minimum bid." *Hathon*'s analysis of the retroactivity of MCL 211.78t and MCL 211.78*l* was a useful framework for considering whether amended MCL 211.78m should be applied retroactively. Like MCL 211.78*l*, amended MCL 211.78m does not contain a clear indication that the Legislature intended for it to apply retroactively, and the provision does not explicitly relate to an antecedent event. Retroactive application of amended MCL 211.78m(1) would impair vested rights because the former version of the provision permitted a governmental unit to exercise its right of first refusal to acquire a foreclosed property for the "minimum bid," while amended MCL 211.78m(1) now requires the governmental unit exercising its right of first refusal to acquire foreclosed property to pay the *greater* of the minimum bid or the fair market value of the property. Retroactive application of the amended statute would impose a new financial obligation on a real-estate transaction that took place years earlier. Accordingly, amended MCL 211.78m applies only prospectively to claims accruing after 2020 PA 255 became effective, i.e., claims accruing on or after January 1, 2021. The Court of Appeals erred by concluding otherwise.

3. MCL 211.78t, as enacted by 2020 PA 256, establishes the procedure under which a claimant may seek to recover any surplus proceeds from an eventual foreclosure sale. MCL 211.78t(11) provides that § 78t is the "exclusive mechanism for a claimant to claim and receive any applicable remaining proceeds under the laws of this state." Under MCL 211.78t(12)(b), "remaining proceeds" is defined as "the amount equal to the difference between the amount paid

to the foreclosing governmental unit for a property due to the sale or transfer of the property under section 78m and the sum of" (1) the minimum bid, (2) other fees and expenses incurred by the FGU not included in the minimum bid, and (3) a sale commission. Under former MCL 211.78m(1), the amount paid to the FGU when a governmental unit retained the property by exercising the right of first refusal was the minimum bid, which is the amount of the tax debt along with associated interest and fees. "Remaining proceeds" does not include the additional value associated with the real property that was acquired or retained by a governmental unit when the retained value was not reduced to a monetary amount through a sale. Therefore, when a governmental unit has exercised its right of first refusal under former MCL 211.78m(1) and purchased the property from the FGU for the minimum bid, the process outlined in MCL 211.78t for recovering remaining proceeds does not govern a claimant's dispute regarding the additional value associated with the real property that was acquired or retained by the governmental unit. Instead, such claimants should proceed through standard processes of inverse condemnation, separate from the statutory process of MCL 211.78t, to recover that additional value. Therefore, although the Court of Appeals properly concluded, as held in *Hathon*, that MCL 211.78t applies retroactively, that statute was not applicable in this case and did not preclude plaintiffs from seeking relief.

Court of Appeals' judgment affirmed in part and reversed in part, and case remanded to the trial court for further proceedings.

Justice WELCH, concurring, agreed with the Court's holding that a taking requiring just compensation occurred and with the Court's resolution of the appeal. She wrote separately to address issues that could be important in the future even though they were not necessary to resolve this appeal, given that Oakland County conceded liability rather than arguing that the city, which purchased plaintiffs' properties, was instead the properly liable defendant. Justice WELCH opined that *Hall v Meisner*, 51 F4th 185 (CA 6, 2022)—which held under similar facts that Oakland County was alone responsible for the taking of the plaintiffs' property and that the event that constituted a taking was the vesting of absolute title to the plaintiffs' homes in the FGU—was wrongly decided and that its holdings conflicted with *Rafaeli* and *Tyler v Hennepin Co, Minnesota*, 598 US 631 (2023). Unlike *Hall*, *Rafaeli* and *Tyler* both indicate that an event that gives rise to a compensable takings claim is the event following entry of a judgment of foreclosure when the government fails to provide the divested property owner with the opportunity to seek compensation for the excess monetary value of any property interest that survived the foreclosure. Clarity going forward was necessary because (1) identifying the nature of the property interest and the moment at which it is taken is important for calculating the value of just compensation and (2) *Hall* calls into question the continued viability of tax foreclosures that convey title while the rule stated in *Tyler* and *Rafaeli* does not. Justice WELCH also asserted that Oakland County should not have been liable for just compensation given that the county retained nothing more than what it was owed. Under Michigan law, a county treasurer, acting as the FGU, takes title to real property upon entry of a final judgment of foreclosure. Once the city exercised its right of first refusal in this case, the FGU was required to accept the money and convey title to the city. Therefore, the FGU received nothing more than what it was owed in exchange for the foreclosed properties. The record established that Oakland County's treasurer did not receive any excess beyond what was owed, and therefore, it could not have taken anything that requires payment of just compensation under *Rafaeli*. In sum, Justice WELCH joined the majority because *a* governmental unit received and

retained more than it was owed, resulting in a taking that required just compensation, but she worried that significant legal questions remained unresolved.

Justice HOOD did not participate because the Court considered this case before he assumed office.

# OPINION

Chief Justice:
   Megan K. Cavanagh

Justices:
Brian K. Zahra
Richard H. Bernstein
Elizabeth M. Welch
Kyra H. Bolden
Kimberly A. Thomas
Noah P. Hood

FILED  July 16, 2025

STATE OF MICHIGAN

SUPREME COURT

LOUIS JACKSON, MICHAEL C. BIRAC,
LEE CRAFT, GAYLYNN CRAFT,
RONALD HAYES, SMFJ, LLC, EVERTT
HODGE, DONALD SWINNEY,
STEFANIE BOYD, LISA SMITH, and
KIRK BOYD,

      Plaintiffs-Appellees,

v                                     No. 166320

SOUTHFIELD NEIGHBORHOOD
REVITALIZATION INITIATIVE, FRED
ZORN, CITY OF SOUTHFIELD, KEN
SIVER, and SOUTHFIELD NON-PROFIT
HOUSING CORPORATION,

      Defendants-Appellees,

and

OAKLAND COUNTY,

      Defendant-Appellant,

and

E'TOILE LIBBETT, MICHAEL A. MANDELBAUM, SUSAN WARD WITKOWSKI, also known as SUSAN WARD and SUSAN WITKOWSKI, and GERALD WITKOWSKI,

Defendants.

BEFORE THE ENTIRE BENCH (except HOOD, J.)

BERNSTEIN, J.

This case involves questions raised in the wake of this Court's opinion in *Rafaeli, LLC v Oakland Co*, 505 Mich 429; 952 NW2d 434 (2020). In *Rafaeli*, we held that then-applicable provisions of the General Property Tax Act (GPTA), MCL 211.1 *et seq.*, which permitted governmental units to retain surplus proceeds from tax-foreclosure sales, violated the Takings Clause of the Michigan Constitution, Const 1963, art 10, § 2. Following this Court's decision in *Rafaeli*, the Legislature amended portions of the GPTA by passing 2020 PA 255 and 2020 PA 256, which established a procedure by which claims for surplus proceeds from foreclosure sales would be administered. This Court was then tasked with considering whether *Rafaeli* applied retroactively to pending claims, as well as whether some of the provisions enacted by 2020 PA 256 applied retroactively. In the consolidated cases of *Schafer v Kent Co* and *Hathon v Michigan*, ___ Mich ___, ___; ___ NW3d ___ (July 29, 2024) (Docket Nos. 164975 and 165219); slip op at 31, this Court held that *Rafaeli* applies retroactively to claims that were not yet final on July 17, 2020, the date the opinion was issued. This Court also held that MCL 211.78t, which established the procedure governing claims for surplus proceeds, applies retroactively to claims that arose from public tax-

2

foreclosure sales that occurred before *Rafaeli* was decided. *Id*. at ___; slip op at 4, 33. However, to pass constitutional muster, this provision could not be read to cut off claims for relief that would otherwise have expired between the enactment of MCL 211.78t and this Court's decision in *Schafer*. Therefore, we held that the two-year limitations period imposed by MCL 211.78*l* applies prospectively only. *Id*. at ___; slip op at 38-39.

*Rafaeli* and *Schafer* involved claims for surplus proceeds generated by public tax-foreclosure sales. This case, by contrast, does not arise out of any public tax-foreclosure sales; rather, in this case, plaintiffs' properties were foreclosed on through the GPTA—before *Rafaeli* was decided—and sold for the minimum bid to another governmental unit through the right-of-first-refusal procedure established by former MCL 211.78m, as amended by 2014 PA 501, without having been offered for sale at a public auction. We agree with the judgment of the Court of Appeals to the extent that it held that this constituted a taking under the Takings Clause of the Michigan Constitution. However, we disagree with the Court of Appeals' conclusion that the current version of MCL 211.78m, as amended by 2020 PA 255, applies retroactively. Therefore, we affirm the judgment of the Court of Appeals in part, reverse in part, and remand the case to the trial court for further proceedings.

## I. FACTUAL BACKGROUND AND PROCEDURAL HISTORY

Plaintiffs,[1] individuals who owned real property in the city of Southfield, each became delinquent on their property taxes between 2012 and 2014. Defendant Oakland County (the County), through the Oakland County Treasurer, foreclosed on these properties in accordance with the former version of the GPTA. At the time, the GPTA required the foreclosing governmental unit (FGU) to take title to real property to cover the cost of the unpaid tax debt and associated fees, with no compensation available to the former property owners.[2] See former MCL 211.78m; *Rafaeli*, 505 Mich at 437, 440-441 (explaining how, under the prior version of the GPTA, the FGU retained amounts of money in excess of unpaid delinquent taxes, interest, penalties, and fees, constituting an unconstitutional taking). Under their respective judgments of foreclosure, plaintiffs were given opportunities to exercise their right to redeem their properties by paying all the delinquent taxes, with interest and associated fees, by a specified date. Plaintiffs entered into payment plans with the County's treasurer, but each failed to make the required payments by the specified deadlines. Judgments of foreclosure were entered as to each property, the FGU took title to the properties, and none of the plaintiffs appealed the judgments. The FGU did not put the properties to public auction because defendant city of Southfield (the City) exercised its right of first refusal under former MCL 211.78m(1),

---

[1] Louis Jackson; Michael C. Birac; Lee Craft; Gaylynn Craft; Ronald Hayes; SMFJ, LLC; Evertt Hodge; Donald Swinney; Stefanie Boyd; Lisa Smith; and Kirk Boyd.

[2] An FGU may be either the treasurer of the county in which the property is located or, if the county treasurer has elected to have the state foreclose on the property, the state itself. See MCL 211.78(8)(a). In this case, the Oakland County Treasurer is the FGU and took title to the properties following the foreclosure.

purchasing the properties for the minimum bid with funds from defendant Southfield Non-Profit Housing Corporation (SNPHC).[3]  The properties were subsequently conveyed by the City to defendant Southfield Neighborhood Revitalization Initiative (SNRI).

After title to the properties was transferred to SNRI, plaintiffs filed suit against the Oakland County Treasurer, the City and several of its employees, SNPHC, and SNRI. Plaintiffs made a variety of allegations, including alleged violations of their constitutional rights of procedural due process, substantive due process, and equal protection. Specifically, plaintiffs averred that the actions of the governmental units violated the Takings Clauses of the Michigan and United States Constitutions.  Const 1963, art 10, § 2; US Const, Am V.  Plaintiffs additionally asserted a violation of the GPTA and sought civil damages under the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 USC 1961 *et seq*.  In addition to declaratory and injunctive relief, plaintiffs sought damages for the lost equity in their properties, which would be trebled under the relevant provisions of RICO, and to quiet title to their properties.  In May 2018, the trial court granted defendants summary disposition on all of plaintiffs' claims, reasoning that the court lacked jurisdiction to hear the lawsuit, that plaintiffs lacked standing to bring the suit, and that the suit was further barred by res judicata.  The Court of Appeals agreed that plaintiffs did not have standing to challenge their foreclosures because the County had satisfied the minimum procedural due-process requirements.  *Jackson v Southfield*

---

[3] In June 2016, the City entered into an agreement with SNPHC to fund right-of-first-refusal purchases so that the City could rehabilitate distressed properties to create housing opportunities in Southfield.

*Neighborhood Revitalization Initiative*, unpublished per curiam opinion of the Court of Appeals, issued December 19, 2019 (Docket No. 344058) (*Jackson I*), pp 7-9.

Plaintiffs appealed that decision in this Court. In light of our recent decision in *Rafaeli*, we vacated *Jackson I* and remanded the case to the trial court for reconsideration. *Jackson v Southfield Neighborhood Revitalization Initiative*, 507 Mich 866 (2021). On remand, the trial court granted defendants summary disposition under MCR 2.116(C)(7), (8), and (10), holding that *Rafaeli* did not apply retroactively and, regardless, that plaintiffs did not have protected property interests under the Takings Clauses pursuant to *Rafaeli*. The trial court stated:

> *Rafaeli* clarified the extent of the property interest available to Plaintiffs post-foreclosure and limited it to excess proceeds from a tax foreclosure sale. In the instant case, Plaintiffs have failed to identify a property interest that was taken from them. The Federal Constitutional claims raised by Plaintiffs have been routinely rejected by Federal Courts post *Rafaeli*.

On appeal, the Court of Appeals affirmed in part, reversed in part, vacated in part, and remanded to the trial court for further proceedings, holding that: (1) *Rafaeli* applies retroactively; (2) the trial court erred by holding that the federal Takings Clause did not recognize a protected property interest in plaintiffs' equity in their homes; (3) the trial court erred by concluding that *Rafaeli* did not permit plaintiffs' takings claims against the County under the Michigan Constitution; (4) the trial court erred by refusing to give retroactive application to the amended language in MCL 211.78m and MCL 211.78t; (5) the trial court erred when it summarily disposed of plaintiffs' inverse-condemnation claims; (6) the trial court erred when it granted summary disposition on the claims of two plaintiffs on the basis of res judicata; and (7) the trial court properly granted summary

disposition in favor of the City and corporate defendants as related to plaintiffs' unjust-enrichment and civil-conspiracy claims because plaintiffs could not prove causation. *Jackson v Southfield Neighborhood Revitalization Initiative*, 348 Mich App 317; 18 NW3d 27 (2023) (*Jackson II*).

The County sought leave to appeal in this Court, and we initially held the application in abeyance for *Schafer* to determine whether the holdings in *Rafaeli* applied retroactively to pending claims. Following our resolution of *Schafer*, we ordered oral argument on the application in this case. *Jackson v Southfield Neighborhood Revitalization Initiative*, ___ Mich ___; 12 NW3d 600 (2024).

## II. STANDARD OF REVIEW

On remand, the trial court granted summary disposition to defendants under MCR 2.116(C)(7), (8), and (10). However, the Court of Appeals noted that the arguments regarding the viability of plaintiffs' takings claims under the United States and Michigan Constitutions fell solely within the scope of MCR 2.116(C)(8). *Jackson II*, 348 Mich App at 339-340. We agree with this conclusion and thus view the trial court's decision to grant summary disposition solely under the lens of MCR 2.116(C)(8).

In reviewing a motion for summary disposition under MCR 2.116(C)(8), "[a]ll well-pleaded factual allegations are accepted as true and construed in a light most favorable to the nonmovant." *Maiden v Rozwood*, 461 Mich 109, 119; 597 NW2d 817 (1999). Summary disposition under MCR 2.116(C)(8) is properly granted when the claims are "so clearly unenforceable as a matter of law that no factual development could possibly justify recovery." *Id*. (quotation marks and citation omitted).

7

We review de novo a decision on a motion for summary disposition, *id*. at 118, as well as questions of constitutional law, *Sidun v Wayne Co Treasurer*, 481 Mich 503, 508; 751 NW2d 453 (2008), and questions concerning the interpretation and retroactivity of amended statutes, *Buhl v Oak Park*, 507 Mich 236, 242; 968 NW2d 348 (2021).

## III. ANALYSIS

## A. THE TAKINGS CLAIMS

The protection of privately owned property from undue governmental interference is a deeply entrenched right enshrined in both the federal and state Constitutions. The Fifth Amendment of the United States Constitution, as applied to the states through the Fourteenth Amendment, provides, in relevant part: "[N]or shall private property be taken for public use, without just compensation." US Const, Am V. Michigan's Takings Clause provides, in relevant part:

> Private property shall not be taken for public use without just compensation therefore being first made or secured in a manner prescribed by law. If private property consisting of an individual's principal residence is taken for public use, the amount of compensation made and determined for that taking shall be not less than 125% of that property's fair market value, in addition to any other reimbursement allowed by law. . . .

> "Public use" does not include the taking of private property for transfer to a private entity for the purpose of economic development or enhancement of tax revenues. Private property otherwise may be taken for reasons of public use as that term is understood on the effective date of the amendment to this constitution that added this paragraph. [Const 1963, art 10, § 2.]

8

Michigan's Takings Clause has been interpreted to provide greater protection to private property owners than its federal counterpart in some circumstances. *Rafaeli*, 505 Mich at 454.

In *Rafaeli*, this Court held that

> [the] plaintiffs, former property owners whose properties were foreclosed and sold to satisfy delinquent real-property taxes, have a cognizable, vested property right to the surplus proceeds resulting from the tax-foreclosure sale of their properties. . . . [Therefore, the] defendants' retention and subsequent transfer of those proceeds into the county general fund amounted to a taking of plaintiffs' properties under Article 10, § 2 of our 1963 Constitution. [*Id*. at 484-485.]

This Court has since held that *Rafaeli* applies retroactively to claims that were not yet final when *Rafaeli* was issued. *Schafer*, ___ Mich at ___; slip op at 21.

In this case, the operative question is whether a taking occurs when property was not offered for sale at a public auction because a governmental unit other than the state purchased the property from the FGU for a minimum bid through the right-of-first-refusal process outlined in former MCL 211.78m. The Court of Appeals concluded that these property transfers constituted a taking under the same principles outlined by this Court in *Rafaeli*. *Jackson II*, 348 Mich App at 360-362. We agree that this scenario constitutes a taking under the Michigan Constitution.

*Rafaeli* provides context to our decision here. In *Rafaeli*, 505 Mich at 456-473, this Court undertook a comprehensive review of the historical principles underlying this state's jurisprudence related to claims for surplus proceeds following a tax-foreclosure sale. Considering common-law principles dating back to the Magna Carta that have been repeatedly reaffirmed in both statutory and common law, we explained:

9

It is clear that our 1963 Constitution protects a former owner's property right to collect the surplus proceeds following a tax-foreclosure sale under Article 10, § 2. This right existed at common law; was commonly understood to exist in the common law before the 1963 ratification of our Constitution; and continues to exist after 1963, as our decision in *Dean* [*v Dep't of Natural Resources*, 399 Mich 84; 247 NW2d 876 (1976),] demonstrates. Because this common-law property right is constitutionally protected by our state's Takings Clause, the Legislature's amendments of the GPTA could not abrogate it. While the Legislature is typically free to abrogate the common law, it is powerless to override a right protected by Michigan's Takings Clause. [*Id*. at 473.]

This Court's *Rafaeli* decision was couched in our specific consideration of the right to recover any surplus funds the FGU might receive from a public tax-foreclosure sale. *Rafaeli* did not present this Court with the opportunity to consider a scenario in which the GPTA mandated that no public foreclosure sale take place. Under former MCL 211.78m, when a judgment of foreclosure entered, absolute title to the delinquent property passed to the FGU. If the FGU was not the state, the state was presented with the opportunity to exercise the right of first refusal to purchase the property from the FGU for "the greater of the minimum bid or its fair market value . . . ." Former MCL 211.78m(1). If the state did not exercise this right to purchase the property, the city, village, or township could purchase the property "for a public purpose" from the FGU for "the minimum bid." *Id*. If the city, village, or township did not purchase the property, the county in which that property was located could purchase the property by payment to the FGU of the minimum bid. *Id*. The "minimum bid" was defined as including "[a]ll delinquent taxes, interest, penalties, and fees due on the property," former MCL 211.78m(16)(a)(*i*), and "[t]he expenses of administering the sale," former MCL 211.78m(16)(a)(*ii*). If none of these governmental units exercised their right to purchase the foreclosed property, the FGU or an agent for the FGU was required to attempt to sell

10

the property by public auction. Former MCL 211.78m(2). Therefore, under former MCL 211.78m, a foreclosure sale would commence only if neither the state nor the city, village, township, or county in which the property was located purchased the property from the FGU. Once a right of first refusal had been exercised, however, the FGU had no discretion and was required to sell the property to the governmental unit that had invoked the right. Former MCL 211.78m.

Here, the state declined to purchase plaintiffs' foreclosed properties, but the City exercised its right of first refusal. Under former MCL 211.78m(1) and former MCL 211.78m(16)(a), there was no possibility of surplus proceeds from a foreclosure sale because the properties were never placed for public auction and the statute restricted the City's purchase amount upon exercise of its right of first refusal to the "minimum bid."[4] Accordingly, there was no opportunity for the FGU to receive, let alone retain, any surplus funds. See *Rafaeli*, 505 Mich at 437 ("[D]efendants' retention of . . . surplus proceeds is an unconstitutional taking . . . .").

---

[4] We take no position on the validity of a right of first refusal exercised under former MCL 211.78m by the state because former MCL 211.78m instead required the state to purchase a property for "*the greater of* the minimum bid or [the property's] fair market value" and such a scenario is not before our Court. Former MCL 211.78m(1) (emphasis added). We note that, under the amended version of MCL 211.78m, the state still has the initial right to purchase a foreclosed property from the FGU for the greater of either the minimum bid or the fair market value. If the state does not exercise its right to purchase the property, the other governmental units may still purchase the property under a right of first refusal. If there has been no claim for remaining proceeds, the governmental unit may, as before, purchase the property for the minimum bid. However, if a claim for remaining proceeds has been filed, the governmental unit must pay the greater of the minimum bid or the fair market value. MCL 211.78m(1).

11

Despite this distinction, the same principles that underpinned this Court's decision in *Rafaeli* hold true in the scenario presented by the case before us. In the foreclosure-sale context of *Rafaeli*, we explained:

> As the foreclosing governmental unit under the GPTA, defendants were entitled to seize plaintiffs' properties to satisfy the unpaid delinquent real-property taxes as well as any interest, penalties, and fees associated with the foreclosure and sale of plaintiffs' properties. But defendants could only collect the amount plaintiffs owed and nothing more. [*Rafaeli*, 505 Mich at 474.]

This remains true even when a property is not offered for sale at a public auction; the only distinction is how we determine whether the government collected more than it was owed "to satisfy the unpaid delinquent real-property taxes as well as any interest, penalties, and fees associated with the foreclosure and sale of plaintiffs' properties." *Id*. Where a public foreclosure sale occurs, the government commits a taking only if it retains any surplus proceeds received from the sale of the property. *Id*. at 483-484; see also *Yono v Ingham Co*, ___ Mich ___, ___; ___ NW3d ___ (July 16, 2025) (Docket No. 166791); slip op at 6-8. But where, as here, there are no sales by public auction, the government commits a taking if the value of the property retained exceeds what the government was owed. The government cannot evade long-established methods of disposing of foreclosed properties through public sale and simply keep highly valuable property for itself, avoiding paying *any* compensation to homeowners. Such a practice would allow governments to circumvent *Rafaeli* and render its constitutional holding inert for property owners affected by similar takings. As stated in *Rafaeli*, governments have long been prohibited from taking "property *in excess of what is owed*." *Rafaeli*, 505 Mich at 480.

12

We reiterate our conclusion from *Rafaeli* that, when a property has been offered for sale at a public auction, "just compensation requires the foreclosing governmental unit to return any proceeds from the tax-foreclosure sale in excess of the delinquent taxes, interest, penalties, and fees reasonably related to the foreclosure and sale of the property—no more, no less." *Id*. at 483-484. This is because "the property improperly taken was the surplus proceeds, not plaintiffs' real properties," and "plaintiffs are largely responsible for the loss of their properties' value by failing to pay their taxes on time and in full." *Id*. at 482. It remains true that when a surplus results from a public auction, "[i]f plaintiffs were entitled to collect more than the amount of the surplus proceeds, not only would they be taking money away from the public as a whole, but they would themselves benefit from their tax delinquency." *Id*.[5]

But this analysis is not applicable to properties that were not offered for public sale and instead were transferred to another governmental unit for the minimum bid under former MCL 211.78m(1). Because these properties were purchased for the minimum bid in lieu of being made available to purchase through public auctions, to the extent the value of plaintiffs' respective properties exceeded the amount plaintiffs owed in delinquent taxes and attendant fees, we conclude that there was a taking without just

---

[5] Consistently with this holding, we also reaffirm the *Rafaeli* Court's rejection of the full fair market value of plaintiffs' properties as the appropriate measure of damages for a tax-foreclosure taking when a property was offered for sale at a public auction. *Rafaeli*, 505 Mich at 483.

compensation in violation of the Michigan Constitution.[6] We remand to the trial court

for further proceedings not inconsistent with this opinion.[7]

---

[6] Because we have concluded that the activity here constituted a taking under the Takings Clause of the Michigan Constitution, and because the Michigan Constitution provides more expansive protection against takings than its federal counterpart, *Rafaeli*, 505 Mich at 454, we do not address the question of whether the facts of this case present a taking under the Takings Clause of the United States Constitution.

With that said, we acknowledge that the federal courts have addressed issues like those present in both *Rafaeli* and this case. In *Tyler v Hennepin Co, Minnesota*, 598 US 631; 143 S Ct 1369; 215 L Ed 2d 564 (2023), the Supreme Court of the United States addressed the same situation that faced this Court in *Rafaeli* and reached broadly the same conclusion—that a county's retention of money remaining after the foreclosure sale of a condominium was a classic taking in violation of constitutional protections. *Id*. at 639. In reaching this conclusion, the Supreme Court relied on much of the same historical precedent underpinning this Court's conclusion in *Rafaeli*. *Id*. at 637-648.

Germane to this case, in *Hall v Meisner*, 51 F4th 185 (CA 6, 2022), the United States Court of Appeals for the Sixth Circuit addressed a situation nearly identical with the one here and involving several of the same parties. Addressing the same right-of-first-refusal issue present in this case, the Sixth Circuit held that a taking had occurred even in the absence of a foreclosure sale at public auction, in violation of the Fifth Amendment of the United States Constitution. The *Hall* court stated:

> The defendants, for their part, insist throughout their briefing that, under Michigan law, a homeowner's equitable interest in her property is limited to any "surplus" proceeds after a foreclosure sale conducted by the " 'foreclosing governmental unit.' " See *Rafaeli*, 505 Mich at 462 . . . . (Of which there were none here, because there was no public foreclosure sale.) But that proposition, as shown above, overlooks the very reasons *why* a property owner has a right to the surplus. That right does not arise in manner akin to quantum mechanics, materializing suddenly without any apparent connection to anything that existed before. The owner's right to a surplus after a foreclosure sale instead follows directly from her possession of equitable title before the sale. The surplus is merely the embodiment in money of the value of that equitable title. [*Id*. at 195.]

[7] We decline to address the question, raised by the Michigan Association of County Treasurers in its brief amicus curiae, of whether the FGU (here, the County) or the

14

## B. RETROACTIVITY OF MCL 211.78m AND MCL 211.78t

This Court asked the parties to address whether the Court of Appeals correctly concluded that MCL 211.78m, as amended by 2020 PA 255, and MCL 211.78t, as enacted by 2020 PA 256, both apply retroactively. Prior to the amendments, MCL 211.78m(1) stated that a unit of government other than the state exercising its right of first refusal was required to pay only the "minimum bid." Under amended MCL 211.78m(1), any unit of government exercising its right of first refusal must pay the FGU "the greater of the minimum bid or the fair market value of the property." The newly enacted MCL 211.78t sets forth a detailed procedure for a claimant to seek any surplus proceeds from an eventual foreclosure sale. We reaffirm our recent holding in the companion case *Hathon* that MCL 211.78t applies retroactively to existing claims, *Schafer*, ___ Mich at ___; slip op at 37, but hold that the statute is not applicable in this case. We further conclude that MCL 211.78m, as amended by 2020 PA 255, does not apply retroactively to the claims presented by this case.

In considering whether a statute applies retroactively, we are above all driven by the Legislature's intent. " 'All other rules of construction and operation are subservient to this principle.' " *Buhl*, 507 Mich at 244 (quotation marks omitted), quoting *Frank W Lynch & Co v Flex Technologies, Inc*, 463 Mich 578, 583; 624 NW2d 180 (2001). "Statutes are presumed to apply prospectively unless the Legislature clearly manifests the intent for retroactive application." *Johnson v Pastoriza*, 491 Mich 417, 429; 818 NW2d 279 (2012).

---

governmental unit exercising the right of first refusal (here, the City) is the party liable for the taking. This argument was not raised or briefed by the parties, and we will not opine on it here.

15

This Court has enumerated additional factors to consider in assessing whether the Legislature intended for a statute to apply retroactively:

> First, we consider whether there is specific language providing for retroactive application. Second, in some situations, a statute is not regarded as operating retroactively merely because it relates to an antecedent event. Third, in determining retroactivity, we must keep in mind that retroactive laws impair vested rights acquired under existing laws or create new obligations or duties with respect to transactions or considerations already past. Finally, a remedial or procedural act not affecting vested rights may be given retroactive effect where the injury or claim is antecedent to the enactment of the statute. [*LaFontaine Saline, Inc v Chrysler Group, LLC*, 496 Mich 26, 38-39; 852 NW2d 78 (2014) (citations omitted).]

Our recent discussion of the retroactivity of MCL 211.78t and MCL 211.78*l* in *Hathon* both addresses one of the questions before us and acts as a useful framework for considering the other question. *Schafer*, ___ Mich at ___; slip op at 33-37. *Hathon* involved the retroactivity of newly enacted MCL 211.78t, which sets forth a detailed procedure for a claimant to seek any surplus proceeds from an eventual foreclosure sale. This Court concluded that MCL 211.78t applies retroactively to claims arising from foreclosure sales prior to *Rafaeli* "by its plain terms." *Id*. at ___; slip op at 36. We explained that the plain language of the statute clearly indicated that the Legislature intended for it to apply retroactively:

> MCL 211.78t(1)(b)(*i*) explicitly allows litigation prior to *Rafaeli* to proceed "*only if*" the Michigan Supreme Court holds the decision to be retroactive. It also expressly identifies the claims to which it applies as those deriving from "foreclosed property transferred or sold . . . *before*" a specific date prior to the enactment of the statute, i.e., the date *Rafaeli* was issued on July 18, 2020. The statute establishes a specific and detailed process for administrating those claims if and when this condition triggering relief is met. To hold that such a statute itself is prospective borders on misnomer. It is well accepted that "retroactively" means application of a law to "transactions or considerations already past." All sales of property occurring

16

prior to the date of *Rafaeli* occurred *definitionally* prior to the date of the statute; MCL 211.78t unambiguously applies to events and occurrences in the past. [*Id*. at ___; slip op at 33-34 (citations omitted; ellipsis in original).]

The *Hathon* Court observed that the only logical reading of MCL 211.78t requires it to be applied retrospectively.

> By its very terms, MCL 211.78t(1)(b) applies to and bars claims that were based on foreclosures sold "before July 18, 2020." The statute expressly identifies a date certain and specifically states that certain legal rights can be pursued, while others cannot. Further, the statute was enacted after *Rafaeli*; it must by its plain terms apply retroactively to events and occurrences that predated enactment. [*Id*. at ___; slip op at 35-36.]

We reaffirm *Hathon*'s analysis of MCL 211.78t. The plain language of MCL 211.78t is a clear manifestation of the Legislature's intent that the provision apply retroactively. Because the Legislature's intent is reflected in the plain language of the statute, the factors discussed in *LaFontaine* need not be further addressed. Therefore, we affirm the Court of Appeals' holding that MCL 211.78t applies retroactively.

Although MCL 211.78t is retroactive, it does not govern relief in this dispute, nor does it preclude plaintiffs from seeking relief. The language of this provision indicates that it was drafted with an understanding that it would grant relief for remaining proceeds only (1) after a public foreclosure sale *or* (2) after a transfer for fair market value under MCL 211.78m(1), as amended, when a claimant has filed a claim for remaining proceeds from the foreclosed property under MCL 211.78t(2). The provision does not on its face account for a situation in which a city purchases the property for the minimum bid under former MCL 211.78m(1).

MCL 211.78t is the "exclusive mechanism for a claimant to claim and receive any applicable remaining proceeds under the laws of this state." MCL 211.78t(11). However,

17

"remaining proceeds" as employed in MCL 211.78t does not encompass all excess value held by the government following a foreclosure. MCL 211.78t(12)(b) defines "remaining proceeds," the relief obtainable under the statute, as

> the amount equal to the difference between the amount paid to the foreclosing governmental unit for a property due to the sale or transfer of the property under section 78m and the sum of all of the following:
>
> (*i*) The minimum bid under section 78m.
>
> (*ii*) All other fees and expenses incurred by the foreclosing governmental unit pursuant to section 78m in connection with the forfeiture, foreclosure, sale, maintenance, repair, and remediation of the property not included in the minimum bid.
>
> (*iii*) A sale commission payable to the foreclosing governmental unit equal to 5% of the amount paid to the foreclosing governmental unit for the property.

The amount "paid" to the FGU in this case—and in any other case in which a governmental unit retains the property by exercising a right of first refusal under former MCL 211.78m(1)—is the "minimum bid," i.e., the amount of the tax debt along with any associated interest and fees. Former MCL 211.78m(1) ("[A] city, village, or township may purchase . . . [the property] *by* payment to the foreclosing governmental unit of *the minimum bid*.") (emphasis added). "Paid," as used in the definition of "remaining proceeds," clearly encompasses the transfer of money, especially in the context of the foreclosure-sale statute, MCL 211.78m. But the definition of the term "remaining proceeds" does not appear to include the additional value associated with the real property that was acquired or retained by a governmental unit when the retained value was not reduced to a monetary amount through a sale. The value of such property interests could not be obtained through the MCL 211.78t claims process. Regarding plaintiffs' claims,

18

then, "remaining proceeds" would be "the amount equal to the difference between the amount paid to the" FGU and the minimum bid. MCL 211.78t(12)(b). For each plaintiff, the amount paid to the FGU was the minimum bid, so the difference between these figures is zero. Because MCL 211.78t does not provide plaintiffs with any possibility of relief, MCL 211.78t does not govern this dispute and claimants should proceed through standard processes of inverse condemnation, separate from the statutory process of MCL 211.78t.

We next address whether amended MCL 211.78m applies retroactively. Plaintiffs argue that amended MCL 211.78m, requiring that a governmental unit pay "the greater of the minimum bid or the fair market value of the property," applies retroactively, while the County argues that it does not. Consistently with our adherence to the plain language of the relevant statute in *Hathon* as well as the first *LaFontaine* factor, we initially ask whether there is any language specifically providing for retroactive application. In considering the retroactivity of one of the other amended provisions of the GPTA, MCL 211.78*l*, which provided a new two-year limitations period for claims for surplus proceeds, the Court in *Hathon* explained:

> By contrast to MCL 211.78t, MCL 211.78*l* includes no similar language expressly identifying and applying its standard to actions and events prior to enactment. Statutes are generally presumed to apply prospectively, and statutes of limitations specifically have long been presumed to apply prospectively absent "clear and unequivocal manifestation of a legislative preference for retroactive application." Moreover, if MCL 211.78*l* applied retroactively, it would cut off the rights of numerous individuals whose claims accrued prior to the creation of a shortened two-year limitations period. Statutes cannot constitutionally eliminate relief by retroactively shortening a period of limitations without also providing a reasonable period of time for claimants to commence litigation. To avoid interpreting a statutory provision in a manner that would place it in serious constitutional jeopardy, and correspondingly in line with its plain text and established methods of statutory interpretation, the proper reading of MCL 211.78*l* is to

19

apply the new two-year statute of limitations prospectively. [*Schafer*, ___ Mich at ___; slip op at 38-39 (citations omitted).]

Like MCL 211.78*l*, MCL 211.78m does not contain MCL 211.78t's clear indication that the Legislature intended for it to apply retroactively. Rather, MCL 211.78m is silent as to whether its new standard is applicable to events that occurred prior to the amendment. In the absence of such language, the presumption is that the statute applies solely prospectively. *Frank W Lynch*, 463 Mich at 583. Amended MCL 211.78m also does not explicitly relate to an antecedent event, rendering the second *LaFontaine* factor irrelevant.

The remaining *LaFontaine* factors consider the effect of applying an amended statute on existing rights or obligations. Retroactive application of amended MCL 211.78m would be particularly suspect according to the third *LaFontaine* factor, which addresses whether retroactive application of a statute would impair vested rights. Former MCL 211.78m(1) permitted a governmental unit to exercise its right of first refusal to acquire a foreclosed property for the "minimum bid," while amended MCL 211.78m(1) now requires the governmental unit exercising its right of first refusal to acquire foreclosed property to pay the *greater* of the minimum bid or the fair market value of the property.[8]

---

[8] At the time of these transactions, MCL 211.78m(16)(a) provided:

"Minimum bid" is the minimum amount established by the foreclosing governmental unit for which property may be sold under this section. The minimum bid shall include all of the following:

(*i*) All delinquent taxes, interest, penalties, and fees due on the property. If a city, village, or township purchases the property, the minimum bid shall not include any taxes levied by that city, village, or township and any interest, penalties, or fees due on those taxes.

If the amended version of MCL 211.78m were to be applied to a case like the one before us, in which the foreclosures and the City's exercise of its right of first refusal occurred prior to the enactment of the amendment of MCL 211.78m (and indeed, prior to this Court's decisions in *Rafaeli* and *Schafer*), it would impose a new financial obligation on a real-estate transaction that had already taken place. That is, plaintiffs' foreclosed properties were already exchanged for the minimum bid—the amount of outstanding tax debt, plus interest, fees, and applicable penalties—under the former version of MCL 211.78m. Retroactive application of the amended version would require the local governmental unit exercising its right of first refusal to pay the greater of the minimum bid or the fair market value of the property, even though the property transfers were completed several years ago. This is precisely the concern taken into consideration by the third *LaFontaine* factor, which urges us to "keep in mind that retroactive laws impair vested rights acquired under existing laws or create new obligations or duties with respect to transactions or considerations

---

(*ii*) The expenses of administering the sale, including all preparations for the sale. The foreclosing governmental unit shall estimate the cost of preparing for and administering the annual sale for purposes of prorating the cost for each property included in the sale.

As amended by 2020 PA 255, MCL 211.78m(16)(c) now provides:

"Minimum bid" is the minimum amount established by the foreclosing governmental unit for which property may be sold or transferred under subsections (1) to (3). The minimum bid must include all of the delinquent taxes, interest, penalties, and fees due on the property, and may include any additional expenses incurred by the foreclosing governmental unit in connection with the forfeiture, foreclosure, maintenance, repair, or remediation of the property or the administration of this act for the property, including, but not limited to, foreclosure avoidance, mailing, publication, personal service, legal, personnel, outside contractor, and auction expenses.

21

already past." *LaFontaine*, 496 Mich at 39.[9]  Because vested rights would be impaired in this manner, the fourth *LaFontaine* factor also weighs against retroactive application of MCL 211.78m even if the statute is remedial or procedural in nature.[10]

Given the absence of any language in MCL 211.78m that the Legislature intended the provision to apply retroactively, and the fact that retroactive application of amended MCL 211.78m would create new duties with respect to completed transactions, we conclude that MCL 211.78m applies only prospectively to claims accruing after 2020 PA 255 became effective, i.e., claims accruing on or after January 1, 2021.  We reverse the judgment of the Court of Appeals to the extent that it concluded otherwise.

## IV.  CONCLUSION

For the foregoing reasons, we hold that a violation of the Takings Clause of the Michigan Constitution occurs when there are no surplus funds from a public auction but instead the government obtains surplus value from foreclosed properties that were transferred between governmental units for the minimum bid under the right-of-first-refusal process set forth in former MCL 211.78m without ever offering the property for sale at a public auction.  We reaffirm our conclusion in *Hathon* that MCL 211.78t, as

---

[9] Although not couched in the *LaFontaine* framework, arguably a corollary is this Court's observation in *Hathon* that retrospective application of MCL 211.78*l* would have eliminated an avenue of relief for some would-be claimants whose claims had accrued prior to the imposition of the new, shorter two-year limitations period.  *Schafer*, ___ Mich at ___; slip op at 38.

[10] This Court has never taken a position as to whether the fourth consideration under *LaFontaine* should be weighed differently if only statutory rights and governmental parties are involved, and no party to this case has requested consideration of such a distinction. We decline to consider any possible distinction sua sponte.

enacted by 2020 PA 256, applies retroactively to claims that preceded its enactment, but we hold that it is inapplicable in this case. Finally, we conclude that MCL 211.78m, as amended by 2020 PA 255, applies prospectively only. We accordingly affirm the judgment of the Court of Appeals in part, reverse in part, and remand to the trial court for further proceedings not inconsistent with this decision. We do not retain jurisdiction.

Richard H. Bernstein
Megan K. Cavanagh
Brian K. Zahra
Elizabeth M. Welch
Kyra H. Bolden
Kimberly A. Thomas

# STATE OF MICHIGAN

## SUPREME COURT

LOUIS JACKSON, MICHAEL C. BIRAC,
LEE CRAFT, GAYLYNN CRAFT,
RONALD HAYES, SMFJ, LLC, EVERTT
HODGE, DONALD SWINNEY,
STEFANIE BOYD, LISA SMITH, and
KIRK BOYD,

        Plaintiffs-Appellees,

v                                     No. 166320

SOUTHFIELD NEIGHBORHOOD
REVITALIZATION INITIATIVE, FRED
ZORN, CITY OF SOUTHFIELD, KEN
SIVER, and SOUTHFIELD NON-PROFIT
HOUSING CORPORATION,

        Defendants-Appellees,

and

OAKLAND COUNTY,

        Defendant-Appellant,

and

E'TOILE LIBBETT, MICHAEL A.
MANDELBAUM, SUSAN WARD
WITKOWSKI, also known as SUSAN
WARD and SUSAN WITKOWSKI, and
GERALD WITKOWSKI,

        Defendants.

_____

WELCH, J. (*concurring*).

I agree with the Court's holding that a taking requiring just compensation occurred in this case and with the Court's resolution of the present appeal. I write separately to address issues that, although not necessary to resolve this appeal, could be important in the future.

Among other things, this Court's order directed the parties to brief "whether there was a violation of either [the federal or state] Takings Clause by Oakland County under the facts of this case[.]" *Jackson v Southfield Neighborhood Revitalization Initiative*, ___ Mich ___; 12 NW3d 600, 601 (2024). As the majority observes, defendant-appellant Oakland County conceded liability and has not argued that defendant city of Southfield, which purchased the properties at issue, is instead the properly liable defendant.

This is not surprising, considering that at oral argument, Oakland County noted that as far as the federal constitutional claims are concerned, it is bound by *Hall v Meisner*, 51 F4th 185, 196 (CA 6, 2022). In *Hall*, the United States Court of Appeals for the Sixth Circuit held under nearly identical facts that Oakland "County alone is responsible for the taking of the plaintiffs' property." *Id*. In contrast, the Michigan Association of County Treasurers argues in its amicus brief that *Hall* erred on this point and that only the city of Southfield committed a taking because neither the County nor the county treasurer—acting as the foreclosing governmental unit (FGU)—received or retained anything beyond the taxes and fees that were owed. The *Hall* court also held that the "event" that constituted a taking was the vesting of " 'absolute title' to the plaintiffs' homes." *Id*. Although I concur with the Court's decision not to wade into these debates today because of the County's concession of liability, I believe that the *Hall* court erred as to both points of law and that

2

its holdings conflict with *Rafaeli, LLC v Oakland Co*, 505 Mich 429; 952 NW2d 434 (2020), calling into question the legality of tax foreclosure as a mechanism of tax collection.[1]

## I. RIPENING OF A TAKINGS CLAIM FOLLOWING FORECLOSURE

The event that was identified in *Hall* as triggering a taking requiring just compensation was the vesting of absolute title to the foreclosed property in the FGU. Under Michigan's statutory scheme, that event occurs in every noncontested tax-foreclosure matter "on the March 31 immediately succeeding the entry of a judgment foreclosing the property" if the redemption price was not paid. MCL 211.78g(2), as amended by 2020 PA 33.[2] Notably, that date precedes any other governmental unit's statutory right of first refusal under MCL 211.78m, as well as any postforeclosure public auction under MCL 211.78k. Stated differently, absolute title in the foreclosed property will always vest in the FGU *before* it is clear what will ultimately happen with the foreclosed real property or any residual property interest retained by the taxpayer following tax foreclosure.

This Court acknowledged in *Rafaeli* that taxing governmental units are "entitled to seize" property "to satisfy the unpaid delinquent real-property taxes as well as any interest, penalties, and fees associated with the foreclosure and sale of" the property at issue.

---

[1] The analysis in *Hall* only addressed tax-foreclosure schemes in which title to the foreclosed property is transferred following the foreclosure. It did not address tax liens that result from foreclosure, which presumably would be subject to a different analysis.

[2] The same remains true under the current version of the statute. See MCL 211.78g(2), as amended by 2020 PA 256.

*Rafaeli*, 505 Mich at 474. But the government "could only collect the amount [the taxpayers] owed and nothing more." *Id*. The Court then explained that after the FGU "foreclosed on [the property owners'] properties, obtained title to those properties, and sold them to satisfy" the taxpayers' "unpaid taxes, interest, penalties, and fees related to the foreclosure, any surplus resulting from those sales belonged to" the taxpayers. *Id*.

The taking in *Rafaeli* occurred when the surplus funds were retained by the FGU after distribution of the tax-foreclosure-sale proceeds under the relevant statutes. The act of retaining the surplus "amount[ed] to a taking of a vested property right requiring just compensation." *Id*. The taxpayers' property interest in surplus proceeds was "a separate property right that survive[d] the foreclosure process" and was not extinguished by "the vesting of fee simple title to the real property . . . ."[3] *Id*. at 476. This Court observed that

---

[3] The *Hall* court labeled the taken residual property interest as "equitable title," but I find it notable that this Court did not use the same legal term of art when describing the taken property interest that required compensation in *Rafaeli*. Compare *Hall*, 51 F4th at 194-196, with *Rafaeli*, 505 Mich at 459-479. This distinction is significant for purposes of state property law. Under Michigan law, equitable title has typically been described as a property right obtained by the vendee under a land contract, and the vendor retains legal title to the real estate until the vendee's contractual obligations have been fulfilled. *Graves v American Acceptance Mtg Corp (On Rehearing)*, 469 Mich 608, 614; 677 NW2d 829 (2004). Equitable title in that context is a property right created by contract that can be sold, devised, or encumbered. *Id*. *Graves* held that because of the legal relationship and rights created by a land contract, a "mortgage, the proceeds of which are used to pay off a land contract, is not a purchase money mortgage." *Id*. at 616. This Court has also recognized that, in the context of a foreclosure on a mortgage and the postforeclosure sale of property *before* expiration of the redemption period, the property interest obtained and held by the purchaser until expiration of the redemption period can be described as equitable title. *Dunitz v Woodford Apartments Co*, 236 Mich 45, 49-50; 209 NW 809 (1926). The *Hall* court seemed to recognize that it was expanding on what Michigan courts had previously recognized as equitable title. *Hall*, 51 F4th at 195. Most of the cases cited by *Hall* discussed equitable title in the context of different kinds of land contracts under Michigan law and addressed differences between the rights and liabilities associated with equitable and legal title to the land. See *Marquette v Mich Iron & Land Co*, 132 Mich 130;

4

the taxpayers' "takings claim was not compensable until their properties sold for an amount in excess of their tax debts" and that "a former property owner has a compensable takings claim if and only if the tax-foreclosure sale produces a surplus." *Id*. at 476-477.

These aspects of *Rafaeli* seem to be incompatible with *Hall*'s statement that the event giving rise to a compensable takings claim is the vesting of title that occurs every time a tax-foreclosure judgment becomes final. After all, "*Rafaeli* made clear that seizing real property to collect unpaid taxes does not per se implicate Michigan's Takings Clause." *Yono v Ingham Co*, ___ Mich ___, ___; ___ NW3d ___ (July 16, 2025); slip op at 7. Rather, "[t]he government commits a taking only if—when attempting to collect delinquent taxes—it 'appropriates property *in excess of what is owed*.' " *Id*. at ___; slip op at 7 (citation and brackets omitted). But under *Hall*, *Rafaeli's* holding—that a taking occurs only as to excess proceeds—would not be possible if the takings claim occurred as soon as a tax-foreclosure judgment becomes final. This is because the "excess proceeds" are not determined until after the judgment of foreclosure is issued.

If *Hall* is correct, then our holding in *Yono* (released the same day as this decision) would also be suspect because the property in that case was in foreclosure, but we held that

_____

92 NW 934 (1903); *Kerzka v Farr*, unpublished per curiam opinion of the Court of Appeals, issued September 10, 2013 (Docket No. 310938); *Cardinal v United States*, 26 F3d 48, 49 (CA 6, 1994). *Hall* also cited one case concerning division of marital assets under Michigan law, *Reeves v Reeves*, 226 Mich App 490; 575 NW2d 1 (1997), which made the uncontroversial proposition that marital assets are subject to equitable division, but under the appropriate circumstances, separate assets, including the value of real estate purchased before the marriage, are not. Thus, there seems to be a conflict between the nature of the state-law-based property right recognized by *Hall* and the right recognized by this Court in *Rafaeli*. Additionally, it appears that *Hall* may have expanded the concept of equitable title in a manner that is inconsistent with Michigan property law.

5

there was no taking because the property failed to sell at a public auction. In other words, we reaffirmed what we determined in *Rafaeli*: a taking occurs when the government retains an amount over what is otherwise due—the foreclosure judgment alone is not a taking.

*Hall* also seems to conflict with the United States Supreme Court's decision in *Tyler v Hennepin Co, Minnesota*, 598 US 631; 143 S Ct 1369; 215 L Ed 2d 564 (2023).[4] Like Michigan's statutes, the Minnesota tax scheme states that if the tax debt owed is not paid before the expiration of a statutory redemption period, then "absolute title vests in the State, and the tax debt is extinguished." *Id*. at 635, citing Minn Stat 273.01 (2022). Like we did in *Rafaeli*, the *Tyler* Court recognized a constitutionally protected property interest in any surplus proceeds obtained from a tax-foreclosure sale that must be justly compensated if taken pursuant to the Fifth Amendment of the United States Constitution. *Tyler*, 598 US at 644-645.

The conflict between *Hall*'s holding as to the event that gives rise to a compensable taking and this Court's decisions and *Tyler* appears to be linked to how one defines the state-law-based property right that has been taken. In *Rafaeli* and *Tyler*, neither this Court nor the United States Supreme Court concluded that the prior property owner's interest in surplus proceeds was the same as "equitable title"[5] in the real estate itself. But *Hall* labeled

---

[4] I acknowledge, however, that the United States Supreme Court declined a petition for writ of certiorari that was filed in the *Hall* case. See *Hall v Meisner*, ___ US ___; 143 S Ct 2638 (2023)

[5] Both *Tyler* and *Rafaeli* relied on *Nelson v City of New York*, 352 US 103, 108-110; 77 S Ct 195; 1 L Ed 2d 171(1956), a case that the *Hall* court distinguished. One might surmise that a relevant distinction is that in *Nelson*, the taxing authority obtained a mere *tax lien* rather than *title* to the real property. But no such distinction was analyzed in *Hall*, with the

6

the residual property interest owed to the prior property owner as "equitable title," which was extinguished at the time of the foreclosure. *Hall*, 51 F4th at 196.

In summary, *Rafaeli* and *Tyler* both indicate that an event that gives rise to a compensable takings claim is the event following entry of a judgment of foreclosure when the government fails to provide the divested property owner with the opportunity to seek compensation for the excess monetary value of any property interest that survived the foreclosure.[6] The need for clarity is significant for two reasons. First, identifying the nature of the property interest and the moment at which it is taken is important for calculating the value of just compensation. Second, *Hall* calls into question the continued viability of tax foreclosures that convey title while the rule stated in *Tyler* and *Rafaeli* does not.

## II. OAKLAND COUNTY SHOULD NOT BE LIABLE FOR JUST COMPENSATION

My second concern with *Hall* is its conclusion that only the County, as a governmental unit levying taxes, was liable to pay just compensation for the plaintiffs' takings claims even though the County retained nothing more than it was owed. The *Hall* court reached this result because of its conclusion that the act that constituted the taking

---

*Hall* court instead focusing on a statutory mechanism to collect surplus sale proceeds that the property owner did not avail themselves of. See *Hall*, 51 F4th at 196.

[6] A residual interest in the monetary value associated with foreclosed real property beyond the tax debt owed would seem to be better recognized as a personal property interest. See, e.g., *Alisa A Peskin-Shepherd, LLC v Blume*, 509 Mich 1046, 1047 (2022) (noting that "proceeds of a real-estate sale are personal property"); *Bowles v Sabree*, 121 F4th 539, 549-550 (CA 6, 2024) (stating that the property interest taken by the retention of surplus proceeds following a tax-foreclosure sale was a personal property interest that was separate from the real property interest). This also seems to be the conclusion reached in *Freed v Thomas*, 81 F4th 655 (CA 6, 2023).

7

was the vesting of absolute title upon finality of the foreclosure judgment, which took the plaintiffs' "equitable title." See *Hall*, 51 F4th at 196 (" 'The act of taking is the event which gives rise to the claim for compensation.' ") (brackets omitted), quoting *Knick v Scott Twp, Pennsylvania*, 588 US 180; 139 S Ct 2162; 204 L Ed 2d 558 (2019). But if *Hall* selected the wrong moment in time to determine the "act of taking," then its identity of the governmental unit liable for the taking is likely incorrect too.

Under Michigan law, a county treasurer—acting as the FGU—takes title to real property upon entry of a final judgment of foreclosure.[7] MCL 211.78(8); MCL 211.78g(8) as amended by 2020 PA 33; MCL 211.78k(5)(b), as amended by 2016 PA 433. In this case, as well as in *Hall*, a governmental unit unrelated to the County (here, the city of Southfield) purchased the foreclosed real property after exercising its statutory right of first refusal under MCL 211.78m(1), as amended by 2014 PA 501. Once the City exercised that right, the FGU had no discretion and was required to accept the money and convey title to the real property to the City "within 30 days" of the purchase. *Id*.

The FGU received nothing more than it was owed in exchange for the foreclosed property. In fact, the FGU was not statutorily entitled to receive or retain any additional money unless the following provision was triggered:

> If property purchased by a city, village, township, or county under this subsection is subsequently sold for an amount in excess of the minimum bid and all costs incurred relating to demolition, renovation, improvements, or infrastructure development, the excess amount shall be returned to the

---

[7] Putting respondeat superior liability aside, *Hall* inaccurately suggested that Oakland County itself (as opposed to its treasurer) acted as the FGU under Michigan law and that Oakland County received title to the foreclosed real properties. Compare *Hall*, 51 F4th at 194, with MCL 211.78(8).

delinquent tax property sales proceeds account for the year in which the property was purchased by the city, village, township, or county or, if this state is the foreclosing governmental unit within a county, to the land reutilization fund created under section 78n. Upon the request of the foreclosing governmental unit, a city, village, township, or county that purchased property under this subsection shall provide to the foreclosing governmental unit without cost information regarding any subsequent sale or transfer of the property. [MCL 211.78m(1), as amended by 2014 PA 501.]

It does not appear that the quoted statutory provision was triggered. The facts in this case (and in *Hall*) show that the foreclosed properties were transferred by the purchasing city to the city-related defendant Southfield Neighborhood Revitalization Initiative (SNRI). Unless the second transaction between the City and SNRI was for "an amount in excess of the minimum bid," MCL 211.78m(1), as amended by 2014 PA 501, neither Oakland County nor its treasurer would have received anything beyond the taxes, fees, and interest that were lawfully owed. If that is true, then it would appear that the city of Southfield and SNRI are the only entities that received more than what was owed. The record before us shows that Oakland County's treasurer did not receive any excess beyond what was owed; therefore, it could not have taken anything that requires payment of just compensation per our decision in *Rafaeli*.

But because *a* governmental unit received and retained more than it was owed, I join the majority in holding that a taking requiring just compensation occurred. The "government" is not a monolithic entity for purposes of legal liability. Although I understand the County's decision to concede liability to pay compensation following the ruling in *Hall*, I worry that important questions of jurisprudential significance for Michigan property and constitutional law are being left unresolved. I suspect that nuanced conflicts

like those I have discussed will need to be worked out in the future given the proliferation of takings claims based on tax foreclosures in Michigan and across the country.

Elizabeth M. Welch

HOOD, J., did not participate because the Court considered this case before he assumed office.